and Michael T. Chong responding to the meeting. Arguing on behalf of the petitioner's counsel, Mr. Robert H. Lange. Arguing on behalf of the respondent at the meeting, Mr. Stephen H. Hessen.  Mr. Hessen. Mr. Hessen. Mr. Lange, there's an open motion to cite additional authority. Shanrock versus Skyline. Is there any objection from NAPLI? Thank you, Your Honor. That motion is granted. Thank you. May it please the Court. Good morning, Your Honors. Good morning, Counsel. My name is Robert Lange. I represent Karen Onishi-Chong. She is the petitioner on the 1401 petition in the movement of the Rule 219C Spoliation of Evidence motion. Both are at issue on this appeal. We feel that the trial court got issues of law and fact wrong, and if you find our way in either, any one of those, that you should reverse the 1401 summary judgment. As far as the matters of law, the trial court basically disregarded Mr. Chong's fraud when it came to Ms. Onishi-Chong's due diligence burden. In other words, the trial court held that Mr. Chong's fraud was basically irrelevant to that burden. It did not lessen or impact it. Counsel, how could you establish due diligence as a matter of law here, regardless of the timeliness of the petition, when in the pretrial settlement memo there were suspicions expressed regarding Michael's income? Yes, those were just suspicions, and you know we have a 408 issue that we're raising an appeal as to that, and I can get to that later. But those were just unprovable suspicions. We had discovery responses in the form of answers to interrogatories, sworn answers to interrogatories that represented $240,000 per year. And that was as of 2014. What we found out later, it was $672,000. We also had other discovery devices. There was a joint, I'm not a divorce lawyer, and I'll point that out, but there was a joint valuation expert that was part of the discovery process in this case to value the business. And there was a forensic CPA named Lee Gould. And as part of that interview process, Mr. Royce and Mr. Chong represented to him and to Karen that the reason that Mr. Chong was making so much less during the divorce was because Mr. Royce originated more clients, something that would be true then and true going forward. That's what they represent. That was their new normal. We found out right after the year of the divorce and the year after, Mr. Chong was paid $376,000 more than Mr. Royce, despite originating less clients at that same ratio. And also there was another misrepresentation in the discovery process that their company was going through a period of declining growth, when in reality, as we found out later, it was going through explosive growth, and they were telling some of their possible business partners that. So yes, we have unprovable suspicions. And settlement memos, often those are expressed, but we couldn't prove them, and we are entitled to rely on that. In Goldsmith, first of all, a key finding in Goldsmith is that there was actually no fraud. We emphasize that this case does not present a question of fraudulent concealment of facts, as the trial court found below. At least fraudulent concealment, I should point that out. The fraudulent misrepresentations, what the Goldsmith court ultimately found is that the assets at issue either were fully discoverable at the time of judgment, or they were non-marital property. So that's a difference, and I do point out that Goldsmith quote, that they were emphasizing that fraudulent concealment was not part of their decision. Yeah, I know, but what's the difference between fraudulent concealment and fraudulent misrepresentations? Well, in this case we had both. I talked about the misrepresentations, the answers to interrogatories, the origination disparity, the declining growth of voyage. We also have concealment. Later on after, in 2018, in the 1401 discovery, we discovered projections that they were, that Mr. Chong's business partner were promulgating to other parties, projecting the growth. There were tax shelters that sheltered $1.4 million worth of income that were concealed from us that were ongoing during the time of divorce proceedings. And, of course, we have the emails that were deleted all along, all along, from 2012 through 2018 and onward, as far as we know. But, I mean, she had this information enough to put a chart in the pretrial memo showing how everything was split equally in the years preceding the filing, and then after the filing how they worked. I mean, what's to prevent her from going to trial and putting just that before the judges and asking for an imputation of income? Because they explained it. They explained it through the origination. Well, she relied on her explanations, a la Goldsmith. I mean, you can't rely on someone's misrepresentations if you can go to trial and put this in front of the court. And also, part of the prove-up was a specific waiver of any issues of concealment, correct? Yes, Your Honor. The one thing we didn't know is that they were going to true it up later. That's one thing we could not know prior to the divorce judgment, right? For example, let's just say we took the 1401 discovery in 2018 and we found out that we confirmed that they actually continued with this origination disparity all along. We were wrong. We would have been out of luck then, Your Honor. But we were right that they were lying about that. We were right after the fact. But that's something we could not have known. How could we know prior to the divorce judgment that they were going to true up? That was something that was in their minds. Well, that was the suspicion. Again, knowing that this was going on, or suspecting that was going on, and then signing the waiver that I waive all claims, dissipation of assets, concealment of assets, and reimbursement of the marital estate. And she answers the question, yes, I waive. Yeah, but the waiver, Your Honor, also part of it is based on the discovery conducted in the divorce judgment itself that said that there was full and truthful discovery. And there is a genuine issue of material fact as to whether there was full and truthful discovery. And again, Goldsmith talks about even in the face of an affidavit saying there's been truthful discovery, you can't rely on that. Maybe Goldsmith is wrong, but that's what Goldsmith says. Well, first of all, like I said, Goldsmith, the finding was the fraud was fully discoverable at the time of judgment. It was not fully discoverable. What's the difference if, let's say there was no true up situation that was going to take place later. Let's just say that the income is coming in, and we're splitting it equally, but we're putting in the books that we're not. So basically under the table, I'm getting this true up at the time. What's the difference between that and what happened, a true up later? I mean, why is this true up later such a big deal when, in fact, the fraud could have been taking place right at the same time? Well, Your Honor, the difference is they represented to us in discovery that they would not do that. And that's, I think, where the disconnect here is. Really the question is when somebody acts fraudulent in discovery, who bears the impact of it? Is it the litigant who committed the fraud, or is it the innocent party? And we do cite cases like Ropeneck and the other cases that we cite that lessen or eliminate the due diligence burden in the case of fraud. Well, in cases where there is a representation by counsel, where there's a lack of discovery, you don't have that here. You have high-level divorce lawyers throughout this entire proceeding, correct, on both sides? I would say so. I wouldn't dispute that. I'm not going to denigrate the divorce lawyers. Well, I'm just saying, you have experienced divorce lawyers on both sides throughout this entire process. And her divorce lawyer, who's very experienced, looks at these numbers and sees this issue. And instead of proceeding to trial and laying it out in front of the judge, decides to settle for what she settled for and specifically waive any concealment issues. Well, yes, that's true. But is she entitled to rely on discovery? I get back to it. First of all, we cite the Ossendorf case, which is a 1401 case that was vacated, the 1401 based on false answers to her interrogatories. Failure to comply with the obligation of full and truthful discovery imposed on litigants by her discovery rules constitutes fraudulent concealment. Marsh v. Lake Forest Hospital, this court held that we don't allow fractional discovery. Half-truths are outright lies. Michael and Thomas, when they formed this corporation, agreed to a 50-50. It was 50-50, right? Yes. So she knew at some point in time his income was going to go up. No. Why? Because they represented that as long as Mr. Royce originated more clients than Mr. Chong, he would make more money. That was the representation we relied on. So he was just going to continue on not going out and getting more clients. The point is that he had the opportunity to make more money back then. Well, what I'm saying is, Your Honor, is if when we took our 1401 discovery that turned out to be the case, that they did follow the origination disparity, then we wouldn't be here without question. So that was a lie. That was a lie. When we busted them on the lie, they came up with a different story in the 2018 discovery. They said, well, it wasn't the origination disparity, despite that's what they told us in discovery. They said, well, Mr. Chong was working less. That's why he made less. And then we thoroughly debunked that story, too. So the impact on evidence. All we want is our data in court. There's genuine issues of material fact here as to how these interact. Did she conduct due diligence in light of the fraud? We're not here after a trial. The second issue of law I think that actually goes to the summary judgment of the 219C motion is the spoliation of evidence. We sent an evidence preservation letter in April of 2016, and then we filed the 1401 in May of 2016. Throughout that litigation, Mr. Chong blatantly testified, I continually delete my e-mails. When we deposed him in 2018, he deleted all his e-mails. Nevertheless, there was no motion to continue the argument on the summary judgment motion to get that motion heard, was there? Your Honor, no, there wasn't. But we did file the 219C. One thing that is wrong, I think, in their case is we did actually file the 219C motion before the summary judgment ruling. And one other thing, and also in response to the summary judgment motion, we asked for an adverse inference. Again, this is an issue, an instance where the trial court put the burden on the innocent party of the bad conduct. And the law doesn't put it that way. When you spoliate evidence, when you destroy evidence, we cite the R.J. Management case, the courts will take every adverse inference against you. So that adverse inference would have played into the summary judgment. That would have helped create a genuine issue of material fact, that the evidence that he destroyed, that he deleted, would have been adverse to him. All this discovery you were seeking that relates to the spoliation motion relates to the 214.01 petition after the Meryl Sondland agreement was entered into, correct? Well, Your Honor, when you look at the date parameters of the discovery, it does go back to 2012. But I mean, the motions for discovery were filed after the MSA. Yes. I mean, the spoliation motion, absolutely correct. I mean, what I'm getting at is the trial judge, if the trial judge is correct in saying that you should have done 214.01 motions or petitions are not for a do-over, and you should have done all this before you entered into the agreement, then really the spoliation motion is moot, is it not? Again, I'm not saying you buy that. But if you buy that ruling. Yes, but we did discovery in the worst case. We issued an error. I know that. I know that. But there's no spoliation motion as it relates to prior to the MSA. There was no preservation order, correct? Well, you're correct, Your Honor. But, again, the date scope of our interrogatories and requests to produce in the 1401 that was the subject of the spoliation motion, it does go back to 2012. Right. Okay? And that was a litigated issue. And so what the trial court held, and this is, as a commercial litigator, this blew my mind. The trial court held that you can delete e-mails and spoliate e-mails, I should say, if you just hit the delete button instead of using scrubbing software. That was the distinction that made a difference to the trial court. That was an eye-opener for me. I mean, that is just not the way it works. And that was critical to the trial court's ruling. And, again, it not only goes to the summary judgment, but it goes to the 219C. Justice Enum, to your question, we did file the spoliation motion before. We did ask for the adverse inference in the response to the summary judgment. And we wanted to get to trial. We were on the eve of trial. I don't think we should be punished for trying to expedite litigation. This was a hotly contested case. It had gone on since 2012. And we thought we were going to get our day in court, which is what we're here to fight for now. But we thought, we're in the innocent party. The impact of the spoliation of evidence should fall on him with adverse inferences. Let's go to trial. Those legal issues aside, we do feel that there's a genuine issue of material fact as to whether Karen conducted reasonable due diligence. She did discovery. We said there was lies or concealment in that. As to the other issue that the trial court found against us on the waiver, waiver is the intentional relinquishment of a known right. It gets into a state of mind of Karen. There's case law that you can't have waiver in cases of fraud. Because how can you intentionally relinquish known rights when you don't know all the facts relating to those rights? You know, another thing I will point out is that Mr. Chong and Mr. Royce, they resumed their equal pay arrangement in 2016, their year we filed. So this just shows that they planned their compensation according to the litigation. So, Your Honors, can I make a conclusion? Yes, go ahead. Yes. There are important policies here. We realize the policy of finality. But the important policies in our favor are full and truthful discovery and don't destroy evidence. We're asking that you reverse the summary judgment finding on the 1401 petition, that you reverse the denial of the 219C motion to remand with instructions as to a variety of relief that the trial court can enter, and that you just give us our day in court. You've proved the right to that. Thank you. Mr. Peskin. Good morning, Your Honors.  The fundamental question, I think, here is whether or not a 214-01 can rely on evidence that occurs post-judgment and is being used to interpret events that occur pre-judgment. I would respectfully suggest that the precedent of this court, the Union Bank and Trust v. Green, would say no. And in that particular case, Justice Nash, writing for the court, had indicated that it is impermissible for a court to consider after-occurring events in interpreting pre-decree events. Could they have gotten that evidence of pre-judgment, of the true up and certain of the other facts that we've talked about? Well, respectfully, Your Honor, I think that that post-decree information, theoretically, would be a corroboration or an extension of facts that she was aware of pre-decree. She alleged in her pretrial memorandum that there was a divergence of income that was calculated to try to enhance Mr. Chong's divorce position, which, by the way, he has denied repeatedly. But, nevertheless, she was aware of the underlying events. So if certain events occurred afterwards, which theoretically confirmed what she believed to be the case pre-decree, I would suggest to the court that that should not properly be considered. So, as the court is aware here, we basically have a situation where Ms. Onishi Chong says to the trial court in her pretrial memorandum, I believe that there's some foul play. She does this on April 14, 2014, in a document filed with the court. Roughly one month later, she says, I'm going to settle my case. She received a very fair maintenance award, $12,500 per month for 54 months. Presumably, these issues that were raised with the trial court were taken into consideration when the negotiations were occurring. She proved up the case, signing a marital settlement agreement. And then roughly two years later, relying on that information she filed with the trial court on April 14, asked that the judgment be set aside. Again, coming back to the Union National Bank and Trust case, this court has consistently, jealously protected the viability of trial court judgments. And speaking personally, your divorce court is messy. And it is a place where a lot of people have second thoughts about agreements and questions, and I should have done this, and I should have done that, and it's a very emotional forum. And the law should not allow litigants to get multiple bites of the apple. And again, had she never raised an issue and discovered it post-decree, that would be a different fact pattern. Or had she tried the case and she had some prejudice? The argument is that she relied on the representations made pre-trial as to why the income had changed. Yes. So why couldn't she rely on that and then raise this later when it turns out that those were false? Well, she says she relied on it, but she makes an inconsistent statement to the trial judge saying, I think it's all baloney. So when she says, I relied on that, that's really dispelled by her own words, her proclamations to the trial court saying, I don't believe it. How could she have proved that at the time? I guess the same way that she is trying to prove it now by arguing they had a 50-50 agreement, that the reasoning for why it diverged from the 50-50 was impermissible. She could have asked the trial judge, which trial judges have the power to do under our law, to impute income. I'd also point out that, as Judge McJoint pointed out, her proclamations that I really thought his income was $240,000 doesn't make sense in the sense that Michael would have then been paying 65% of his income in the maintenance. And let me come back to the interrogatories, because they keep coming back saying there was this misrepresentation of income being $240,000. The interrogatories are in the record. He says his base income was $240,000. See attached K-1, which reflects his distribution from the entity. She received his tax returns during the discovery process. She subpoenaed the records from the independent, neutral business evaluator, who had all of the business records at that point. This is not somebody who wandered into the horse court blindly. She had over two years, or almost two years, of discovery that was done. We attached to our motion for summary judgment the affidavit of Martin Farrell, who was the trial attorney at that time, who laid out in detail all of the circumstances leading up to the entry of the judgment. She had outstanding, I think it was six or seven subpoenas to various people, who she ultimately subpoenaed in the 214-01, that she let go of. She accepted the benefits of this settlement, and she walked away without these subpoenas being answered. So I don't think one can sleep on their rights and then come and complain, I didn't have adequate information to enter into this agreement. Can you address the issue of the adverse inference that the trial court did? She alleges that the trial court should have found an adverse inference against Michael for deleting the emails. A couple of comments with regard to that. First of all, by her admission in her motion for summary judgment, she described the avalanche of evidence that she had in her case, this was in her response to the motion for summary judgment, that was so overwhelming the summary judgment should be in her favor, not in our favor. So the question really is, would these additional emails be cumulative and irrelevant in terms of the core proceeding of her case? Judge McJoint pointed out, which was true, that she had already through subpoena received about 10,000 emails at the time that the hearing was going forward. I'd also circle back to Justice Enoff's comments about the summary judgment went forward with no objection at all based upon the spoliation. I would suggest to the court by her silence that would be a further admission that this was not life or death critical to sustain the cause of action under the 214-01. So for those reasons, we believe that the trial court did not err and abuse its discretion. Did the trial court err in relying on the pretrial memo? I don't believe that the court erred in the sense that it was being used by the trial court to show that there was no due diligence. For that purpose, I would suggest to the court there was no error by the trial court. Under 408, and we had spoken to this in our brief, the court properly can rely on evidence that comes before it as part of a settlement negotiation that is not related to the proof of the actual claim that is being made for some other purpose, in other words. Under their theory under 408, what it would basically do is require every trial judge that conducts a pretrial settlement conference to recuse himself or herself because they're aware of the settlement negotiations. I think that's impractical. I don't think that's contemplated by the federal rules upon which our rules are based, nor is it based on our law. So I would suggest he did not err by doing that, did not abuse his discretion. At the time of the settlement, the parties were ready for trial, correct? I'm sorry? The parties were ready for trial when the marriage settlement was completed. Well, they were getting ready for trial, yes. It was essentially an even trial. Was there more discovery ongoing? Well, there were subpoenas that hadn't been answered, but there was no effort to get those subpoenas enforced before the settlement was ended, correct? Yeah, I don't think that, from my recollection of the record, I don't think that there was any deposition scheduled at that point. I think certainly the written discovery had been done. The independent business evaluator had done his investigation. I think just the subpoenas were outstanding at that point. Any other questions? I'm sorry, do you have anything else? No, I don't. Okay. As to the Rule 408 issue that Justice Burke asked about, you notice in our tally here that the pretrial memo is what sunk us, and it is absolutely inadmissible under Rule 408, especially the narrative section that echos or espouses those suspicions. Rule 408 bars the admission of statements made during settlement negotiations if you try to use those to invalidate the claim, invalidate our claim, which is what they're trying to do right now. There is no concern about, I think about it from a policy perspective. We know the policy behind 408. Now, if this could be used, we go through pretrial memos all the time. Some judges have forms, others don't. There's a form where you can say, this is my case. It is narrative. A lot of times it is suspicions. I tell you, I'm going to be more skeptical to let it all out there in a pretrial memo if this can be used against me in the future. That is the policy behind 408. There's not going to be recusals. All we're saying is we're not saying that the same judge can't hear a settlement conference and try the case. We're just saying that the pretrial memos can't be used against the litigant. That's it. And that is what sunk us here. As to the pretrial memos, though, we're going to consider them. When you look at Mr. Chong's pretrial memo, he only represented during the three-year period of the divorce up to $364,000. He didn't represent $500,000. And when I took Mr. Farrow's deposition in 2018, I said, was there any evidence in the record that you know of that would have substantiated Karen's suspicion that Michael should be making $500,000? He said no. So his own lawyer said no. And also there's another nuance here. His own lawyer admitted, Mr. Farrow admitted in his 2018 deposition, that Michael's answers to interrogatory should have been amended prior to the judgment. There was one point on it. The answers to interrogatories represented $20,000 a month for the year 2014. Well, we found out in 2018, Michael actually, this true up had started, as we found out later, he increased his W-2 wages to $32,000 a month from $20,000. And Mr. Farrow said, if I would have known that, I would have amended the answer. So literally when we went to the judgment and he said that he had represented his income fully, that was false. You didn't hear a good response to spoliation from Mr. Postman. You don't see one of the briefs. There is no excuse for it. We all know that you can't spoliate evidence. And if we're going to set precedent here for other litigants in Illinois, it's important to emphasize that you have to be full and transparent in discovery. You can't play these games with it. You can't have half-truths. You can't have lies. And you can't delete e-mails that are possibly relevant. Again, I conclude with the fact that all we want is our day in court. There are genuine issues and material facts as to whether the discovery was fraudulent, whether Karen conducted her due diligence, the impact of the destroyed evidence. And for that reason, I ask that you let us have our day in court. Thank you. Thank you. The Court thanks both parties for the quality of your arguments today. The case will be taken under advisement. A written decision will be issued in due course. The Court stands in recess. Thank you.